UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBBIE ROHN and DEAN ROHN,

                    Plaintiffs,                                  Case No. 1:14-cv-83

v.                                                 HON. JANET T. NEFF

VIACOM INTERNATIONAL, INC. *et al.*,

                    Defendants.

_____/

## OPINION AND ORDER

Pending before the Court are the cross-motions of Plaintiffs Debbie and Dean Rohn and Defendant Viacom International, Inc. for summary judgment on the issue of liability in this trademark case. For the reasons discussed herein, the Court denies Plaintiffs' Motion for Summary Judgment (Dkt 205) and grants Defendant's Motion for Summary Judgment (Dkt 197).

## I. BACKGROUND

### A. Factual Background

1.    *Plaintiffs' Trademarks*

In 1990, Plaintiffs incorporated Guppie Kids, Inc., a Florida corporation, in connection with their Guppie Kid apparel concept (JSF[1] ¶ 1). Guppie Kids, Inc. was administratively dissolved on October 11, 1991 for failing to file an annual report (*id.*).

---

[1]Defendant filed a "Joint Statement of Facts" (JSF) (Dkt 200), to which Plaintiffs posed no objection; therefore, the Court has relied on the Joint Statement of Facts for resolution of this motion unless otherwise indicated. *See generally* Judge Neff's Information and Guidelines for Civil Practice § IV.A.2(a).

On February 4, 1992, Plaintiffs obtained design plus words U.S. Trademark Reg. No. 1,674,309 ("the '309 Mark") for the following mark:



(JSF ¶ 2).  The '309 Mark was registered in connection with the following goods:  "Baby bunting, bloomers, boxer briefs, boxer shorts, coats, dresses, hats, jackets, leggings, mittens, pants, shirts, shoes, shorts, skirts, slippers, slips, socks, suits, sweatpants, sweatshirts, sweaters, ties, and underwear" (*id.* ¶ 3).  The '309 Mark was cancelled on August 10, 1998 because Plaintiffs were unable to pursue the manufacture of GUPPIE-branded toys (*id.* ¶ 4).

On September 11, 2007, Plaintiffs obtained design plus words U.S. Trademark Reg. No. Reg. No. 3,290,738 ("the '738 Mark") for the following mark:



(JSF ¶ 5).  The '738 Mark was originally registered in connection with the following goods: "Baby bunting; Bloomers; Boxer briefs; Boxer shorts; Coats; Dresses; Hats; Jackets; Leggings; Mittens; Pants; Shirts; Shoes; Shorts; Skirts; Slippers; Slips; Socks; Suits; Sweat pants; Sweat shirts;

Sweaters; Ties; Underwear" (*id.* ¶ 6). In or around 2009, Plaintiffs deleted shoes and slippers from the '738 Mark because of a lawsuit settlement (*id.* ¶ 7).

On November 17, 2009, Plaintiffs obtained word trademark Reg. No. 3,711,588 ("the '588 Mark") for GUPPIE for use in connection with "Hats, jackets, boxer briefs and/or boxer shorts, pants, shirts, shorts, t-shirts, ties, sweatshirts, hooded shirts, gloves, and infant's underwear" (JSF ¶ 8). Plaintiffs had previously filed for the GUPPIE word mark on April 24, 2008 but abandoned that mark for unknown reasons as of July 8, 2009 (*id.*).

In the early 1990s, Plaintiffs advertised their GUPPIE brand in a children's magazine (JSF ¶ 9). Plaintiffs entered into a License Agreement dated January 17, 1996 with a company called CHAB, Inc. ("the CHAB Agreement") (*id.* ¶ 10). CHAB was owned by Terri Raffaele (*id.* ¶ 11). Pursuant to the CHAB Agreement, CHAB obtained the exclusive right to use the '309 Mark in the United States in connection with t-shirts, shorts, sweatshirts, and sundresses (*id.* ¶ 12). In exchange, CHAB agreed to pay an escalating minimum annual royalty to Plaintiffs in addition to 5 percent of all GUPPIE sales (*id.* ¶ 13). The CHAB Agreement had a 10-year term with minimum annual royalties of $1,000 for years 1–3; $5,000 for years 4 and 5; and $10,000 for years 6–10 (*id.* ¶ 14). Pursuant to the CHAB Agreement, Raffaele intended to attend trade shows and perform various other tasks to grow a brand (*id.* ¶ 15). CHAB never made any sales of GUPPIE products, and, in or about 1998, approximately two years after entering the agreement, Raffaele terminated the license (*id.* ¶ 16).

After termination of the CHAB Agreement, Plaintiffs took over management of brand marketing and ran the business from their home (JSF ¶ 17). Plaintiffs met with two or three marketing companies in the 2000s to explore further marketing their Guppie Kid products (*id.* ¶ 18).

Specifically, in 2006, Plaintiffs met with representatives from marketing agencies Knorr Marketing and Greenlight Marketing (*id.*).  Plaintiffs did not reach an agreement with these companies and did not retain any documents from Knorr Marketing's pitch other than a non-disclosure agreement (*id.* ¶ 19).  In 2006 or 2007, Plaintiffs met with a volunteer business counselor from SCORE Association, a small business mentorship program, to generate marketing ideas and a business plan (*id.* ¶ 20).  Plaintiffs did not keep a copy of the business plan that the volunteer SCORE counselor developed (*id.* ¶ 21).  Plaintiffs never retained or paid a marketing company to market or promote the GUPPIE marks (*id.* ¶ 22).

Each piece of Guppie Kid clothing came with a card with a pledge reflecting the "yuppie guppie" concept:  "we pledge to work very hard to do our best because some day we would like to be a success.  But most important to be a Guppie, we pledge to be kind, loving, and help others.  That would make us truly happy" (JSF ¶ 23).  Plaintiffs also developed "licenses" to be given away with the purchase of GUPPIE-branded clothing, which were "little cards" intended to be "another thing for the kids to be reminded to work hard and to be kind" (*id.* ¶ 24).  Plaintiffs also gave away bookmarks and magnets with each purchase to remind kids and parents of the brand, as well as a behavior chart that can be accessed on the Guppie Kid website (*id.* ¶ 25).  Plaintiffs also worked with Debbie Rohn's sister-in-law to develop a Guppie theme song, a copy of which would be given to purchasers of GUPPIE-branded clothes (*id.* ¶ 26).  When a few child suicides occurred in Cadillac, Michigan, Plaintiffs used the Guppie Kid brand to promote an anti-bullying message (*id.* ¶ 27).

From approximately 2005 to the present, Plaintiffs expended approximately $50,000 in connection with the '309 Mark, the '738 Mark, and the '588 Mark (collectively, "the GUPPIE Marks"), including expenses for computer equipment, travel expenses and product purchases from

4

their manufacturer (JSF ¶ 28).  Dean Rohn estimates that Plaintiffs spent an additional $50,000 in connection with the GUPPIE Marks in the period from 1990 to 2005 (*id.* ¶ 29).  Of the approximately $100,000 spent by Plaintiffs in connection with the GUPPIE Marks between 1990 and 2015, approximately $25,000 were legal fees (*id.* ¶ 30).

Plaintiffs' GUPPIE apparel has been available for sale on Plaintiffs' website—www.guppiekids.com—since 2005 (JSF ¶ 31).  Plaintiffs do not have documentation demonstrating any sales of Guppie Kid products outside of Michigan through their website prior to 2012 (*id.* ¶ 32).  Plaintiffs made three sales from the www.guppiekids.com website in 2012 and two sales in 2013 (*id.* ¶ 33).  Plaintiffs have no documentation to establish any website sales since 2014 and are unaware of any such sales (*id.*).  Dean Rohn estimates that from 1990 to 2005, Plaintiffs sold between $5,000 and $10,000 of GUPPIE branded product (*id.* ¶ 34).  Plaintiffs' Guppie Kid brand has produced $2,000 in income from 2005 to 2015 (*id.* ¶ 35).  Plaintiffs have produced all existing documentation regarding sales of Guppie Kid clothing (*id.* ¶ 36).  Documentation of Guppie Kid sales prior to 2005 does not exist because Plaintiffs' computer containing those records crashed, and there is no way to recreate the lost records (*id.* ¶ 37).

2.    *Defendant's Trademark*

Robert Scull is one of the creators of Defendant's Bubble Guppies show and is its executive producer (JSF ¶ 38).  Jonny Belt is Scull's business partner, a co-creator of Viacom's Bubble Guppies show, and the show's executive producer (*id.* ¶ 39).  Scull and Belt originated the idea for the Bubble Guppies show when working on a show called "Little Bill" (*id.* ¶ 40).  They continued to develop the Bubble Guppies concept, and, in spring of 2005, Scull gave Nickelodeon—a division of Defendant Viacom—a pitch package for the Bubble Guppies concept (*id.*).  The Bubble Guppies

5

pilot aired in the summer of 2005 (*id.* ¶ 41).  A series deal for the show was executed at the end of

2005 or beginning of 2006 (*id.* ¶ 42).  Thereafter, the production team worked on producing the show

(*id.*).  The Bubble Guppies show premiered on Nick Jr. in January 2011 (*id.* ¶ 43).

On July 19, 2011, Defendant obtained a trademark for BUBBLE GUPPIES, U.S. Trademark

Reg. No. 3,998,384 ("the '384 Mark") for use in connection with "entertainment services in the

nature of television series, featuring animation, comedy and drama; providing online information

in the field of entertainment concerning television programs" (JSF ¶ 44).  Although all 80 episodes

of Bubble Guppies have not yet aired, the show is out of production, and Viacom does not intend

to produce any additional episodes (*id.* ¶ 45).

Merchandise containing the Bubble Guppies branding is created by manufacturers that

specialize in a given type of merchandise (JSF ¶ 46).  Defendant licenses its intellectual property to

such manufacturers to incorporate in their creation of apparel (*id.* ¶ 47).  The manufacturers then sell

the merchandise through retail merchants with whom they have agreements (*id.* ¶ 48).  Defendant

ultimately receives a royalty percentage of shipments from the manufacturer to the retailer (*id.* ¶ 49).

### B.    Procedural Posture

Plaintiffs initiated this trademark dispute in January 2014 against Defendant Viacom and

numerous third parties, including retailers and non-retailers, alleging that Defendant infringed on

their trademarks through its sale of merchandise relating to its "Bubble Guppies" animated musical

television show, such as the following:



(Dkt 1, Compl. ¶ 22).  In their Second Amended Complaint, filed in July 2014, Plaintiffs assert the following claims against all named Defendants: Trademark Infringement (Count I), False Designation of Origin (Count II) and Unfair Competition (Count III) (Dkt 83).

In the fall of 2014, Plaintiffs stipulated to dismissing the following four Defendants from this case:  Cafe Press, Inc. (Dkt 117); NexTag, Inc. (Dkt 121); Etsy, Inc. (Dkt 134); and Shopzilla, Inc. (Dkt 137).  Further, in July 2015, this Court granted Defendant Goodies for Kiddies' Motion to Dismiss (Op. & Order, Dkt 140).[2]  In addition to Defendant Viacom, the following seven Defendants remain in this case:  Zazzle, Inc.; Gilt Groupe, Inc.; Genesco, Inc.; Kmart Holding Corporation; Kohl's Department Stores, Inc.; Sears, Roebuck and Co.; and Target Corporation.

Following the close of discovery, Defendant Viacom filed a pre-motion conference request, proposing a dispositive motion to resolve the question of its liability on Plaintiffs' three claims (Dkt 182).  Plaintiffs responded and filed their own pre-motion conference request, asserting that the case at bar is a "reverse confusion case" on which they are entitled to summary judgment (Dkt 183 at PageID.1134-1135).  The Court conducted the pre-motion conference on March 7, 2016 (Minutes, Dkt 189).  Counsel agreed that the liability of Defendant Viacom, if any, was the threshold issue for dispositive motion briefing and decision before motions from the third-party retailers and non-retailers would be entertained.  The Court issued a briefing schedule (Dkt 190), and the parties filed their motion papers in June 2016.  Specifically, Defendant filed its motion (Dkt 197), to which Plaintiff filed a response in opposition (Dkt 208).  Plaintiff filed its own motion (Dkt 205), with a supporting brief seemingly identical to its brief in opposition to Defendant's motion (Dkt 207).  Defendant filed a consolidated response in opposition to Plaintiffs' motion and reply brief in further support of its motion for summary judgment on liability (Dkt 203).  Plaintiffs filed a sur-reply (Dkt

---

[2]Plaintiffs filed an appeal from this Court's Opinion and Order (Dkt 153), which the Sixth Circuit Court of Appeals dismissed on October 21, 2015 for lack of jurisdiction (Dkt 165).

206).  Defendant also filed an objection (Dkt 204) to the "Affidavit of Plaintiff Debbie Rohn

Regarding Summary Judgment (on Liability) Issues" (Dkt 210).  Plaintiffs filed a response to the

objection (Dkt 209).

 Having conducted pre-motion conferences in this matter and having fully considered the

parties' written briefs, stipulated statements of fact and accompanying exhibits, the Court finds that

the relevant facts and arguments are adequately presented in these materials and that oral argument

would not aid the decisional process.  *See* W.D. Mich. LCivR 7.2(d).

## II.  CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A.  Motion Standard

 A court properly grants summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R.

CIV. P. 56(a).  The party moving for summary judgment has the initial burden of showing that no

genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v.

J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  Once the moving party has made such

a showing, the burden is on the nonmoving party to demonstrate the existence of an issue to be

litigated at trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The Court must view

the factual evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita

Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Slusher v. Carson*, 540 F.3d 449,

453 (6th Cir. 2008).

 As Defendant points out, "likelihood of confusion" is an essential element that Plaintiffs

must prove to prevail on each of their three claims (Dkt 198 at PageID.1181).  *See Hensley Mfg. v.

ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (setting forth elements of a trademark infringement

claim); *Kwik-Site Corp. v. Clear View Mfg. Co.*, 758 F.2d 167, 178 (6th Cir. 1985) (setting forth

elements of a false designation of origin claim); *Herman Miller, Inc. v. Palazzetti Imports & Exports,*

*Inc.*, 270 F.3d 298, 323 (6th Cir. 2001) (setting forth elements of an unfair competition claim).  The Sixth Circuit uses the multi-factor "likelihood of confusion" test to determine whether there has been trademark infringement, false designation of origin or unfair competition under the Lanham Act, 15 U.S.C. § 1051 *et seq.  Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006) (citing *Two Pesos v. Taco Cabana*, 505 U.S. 763, 780 (1992)).

The Sixth Circuit has recognized four theories of liability for trademark infringement: palming off, confusion of sponsorship (also known as "association"), reverse confusion of sponsorship, and dilution.  *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012).  In their motion papers, Plaintiffs focus on reverse confusion, opining that "everyone thinks that Viacom owns the mark" (Dkt 208 at PageID.1577).  *See generally Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987) (explaining that in a reverse confusion claim, the second or "junior" user seeks to capitalize on the first or "senior" user's goodwill or reputation and "saturates the market with a similar trademark and overwhelms the senior user").  In the Sixth Circuit, trademark infringment analysis requires examination of the same multi-factor test, regardless of the theory of liability.  *Therma-Scan*, 295 F.3d at 630, 640 ("[D]espite TSI's arguments to the contrary, the presence of a reverse-confusion claim does not alter this analysis.").  *See, e.g., Progressive Distribution Servs., Inc. v. United Parcel Serv., Inc.*, 186 F. Supp. 3d 741 (W.D. Mich. 2016).   "The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991).

"'Whether a likelihood of confusion exists is a mixed question of law and fact subject to de novo review.'"  *Grubbs v. Sheakley Group, Inc.*, 807 F.3d 785, 794 (6th Cir. 2015) (quoting *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 515 (6th Cir. 2007)); *Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 624 (6th Cir. 1998).  Any disputes about

the evidence that pertains to the eight factors set forth, *infra*, presents a factual issue. *Data Concepts*, 150 F.3d at 624. "[T]he further determination of whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion." *Homeowners*, 931 F.2d at 1107; *Data Concepts*, 150 F.3d at 624 (explaining that "the balancing of [the factual] findings to determine the ultimate issue of likelihood of confusion is a question of law"). "The legal conclusion that confusion is likely must rest on the particular facts of the case, but when all of the material facts have been determined, the ultimate determination of likelihood of confusion lies within the exclusive jurisdiction of the court." *WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084, 1086 (6th Cir. 1983).

## B. Analysis

"[I]n determining whether there is a likelihood of confusion, the following eight factors should be considered: (1) strength of plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing [ ] channels used; (6) degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion in selecting the mark." *Audi*, 469 F.3d at 542-43. Again, in the course of applying these factors, "the ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners*, 931 F.2d at 1107.

The parties do not disagree on the relevant factors, nor the case law and principles applicable to each factor, only their application to the facts at bar. Defendant argues that application of each of these factors illustrates that Plaintiffs' three claims lack merit. Defendant argues that it is also entitled to summary judgment on Plaintiffs' reverse confusion theory for the same reasons and because there is no record evidence to support Plaintiffs' theory (Dkt 198 at PageID.1193-1194). In response, Plaintiffs opine that the legal standard of "likely to cause confusion," especially in a reverse confusion case, is simpler than Defendants urge, and Plaintiffs request that this Court grant

summary judgment in their favor (Dkt 208 at PageID.1569-1576).  The Court will consider each factor, in turn.

1.    *Strength of Plaintiffs' Marks*

This first factor focuses on "the distinctiveness of a mark *and* its recognition among the public." *Therma-Scan*, 295 F.3d at 631 (emphasis added).  "Strength is a combination of the mark's place on the distinctiveness scale and its degree of acquired distinctiveness, how well it is recognized in the marketplace and how clearly it is actually associated with a particular source." *Citizens Banking Corp. v. Citizens Fin. Group, Inc.*, 320 F. App'x 341, 346 (6th Cir. 2009) (citation omitted). In other words, "[a] mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source." *Homeowners*, 931 F.2d at 1107.

In this regard, Defendant argues that Plaintiffs' marks are weak because they have little consumer recognition (Dkt 198 at PageID.1182-1183).  Like the plaintiff in *Therma-Scan*, Plaintiffs do not respond by attempting to establish that their marks are widely recognized among the general population.  Instead, Plaintiffs respond that this factor weighs in favor of a finding of likelihood of confusion because both their logo mark and their word mark are "incontestable," inasmuch as the marks have been in continuous use for five consecutive years after the date of registration and are still in use in commerce (Dkt 208 at PageID.1577-1578).

Like the plaintiff's argument in *Therma-Scan*, Plaintiff's argument here is misplaced.  "Even where a trademark is incontestable and 'worthy of full protection,' the significance of its presumed strength will depend upon its recognition among members of the public." *Therma-Scan*, 295 F.3d at 632.  "Treating a valid, incontestable trademark as an exceptionally strong mark for the purpose of determining whether confusion is likely to occur, without examining whether the mark is distinctive and well-known in the general population, would shift the focus away from the key

11

question of 'whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.'" *Id.* (quoting *Homeowners*, 931 F.2d at 1107).

Moreover, "even if a mark is on the strong side of the distinctiveness scale, it can still be a weak mark if it has low recognition among the public." *Citizens*, 320 F. App'x at 346 (citing *Therma-Scan*, 295 F.3d at 631, and *Homeowners*, 931 F.2d at 1107). Defendant points out that there is extensive third-party use of similar marks in commerce (Dkt 203 at PageID.1416), a point that Plaintiffs not only failed to refute in their response but also acknowledged in their Second Amended Complaint in describing their efforts to protect their marks in the face of "Guppies Popping Up All Over" (2d Amend. Compl., Dkt 83 at PageID.533).

In short, this factor weighs against a finding that confusion with Defendant's Bubble Guppies mark is likely. The Court's analysis also reveals the weakness of Plaintiffs' reverse-confusion theory, which requires that Plaintiffs' mark was of a strength upon which Defendant, the purported junior user, could even capitalize.

2.    *Relatedness of the Goods*

In examining the relatedness-of-the-goods factor, "[t]he question is, are the [goods or services] related so that they are likely to be connected in the mind of a prospective purchaser?" *Homeowners*, 931 F.2d at 1109 (citation omitted). In that analysis, "courts must examine whether the products of the parties perform the same function..." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 283 (6th Cir. 1997).

Defendant argues that the goods at issue are not related because they do not perform the same function and are targeted to different demographics (Dkt 198 at PageID.1185). Specifically, Plaintiffs' GUPPIE apparel is intended to embody a "yuppie kid" concept, reflected by the GUPPIE

12

acronym: "Growing Up, Playing, Pursuing Individual Excellence" (*id.*). According to Defendants, Plaintiffs are attempting to promote their concept to school-age children, as evidenced by Plaintiffs' development of various "licenses," behavior charts, bookmarks, magnets and bracelets (*id.*). Defendant points out that its mark, in contrast, reinforces specific connections formed between preschoolers and cartoon characters on the Bubble Guppies musical show (*id.* at PageID.1186).

In response, Plaintiffs merely posit that "obviously this factor weighs in favor or [sic] finding confusion" because "[t]he goods sold by Plaintiffs are children's clothing. The goods sold by Defendant are children's clothing" (Dkt 208 at PageID.1578).

The Court is more persuaded by the nuances of Defendant's argument than Plaintiffs' two-sentence declaration that the goods are related simply because they are clothes. "Goods or services are not necessarily related ... simply because they 'coexist in the same broad industry.'" *Therma-Scan*, 295 F.3d at 633. Moreover, Plaintiffs have produced no evidence that children have, or would, confuse BUBBLE GUPPIES apparel and GUPPIE clothing. The Court determines that the record does not support a likelihood of confusion of sponsorship, affiliation or connection with Defendant's Bubble Guppies mark based on the alleged relatedness of the goods.

3.    *Similarity of the Marks*

"In assessing similarity, 'courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark.'" *Maker's Mark*, 679 F.3d at 421 (quoting *Daddy's Junky Music*, 109 F.3d at 283). Further, "courts should examine the pronunciation, appearance, and verbal translation of conflicting marks." *Id.* "It is the impression which the mark

13

as a whole creates on the average reasonably prudent buyer and not the parts thereof which is important." *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987) (quoting J. Thomas McCarthy, Trademarks and Unfair Competition § 23:15 (2d ed. 1984)).

Defendant argues that beyond the words "Guppie" and "Guppies," the purportedly conflicting marks have no similarity (Dkt 198 at PageID.1187). According to Defendant, Plaintiffs' GUPPIE marks are not actionably similar to Defendant's BUBBLE GUPPIES mark because "the public would not mistake Plaintiffs' tie-wearing fish with Viacom's rounded and bubbly BUBBLE GUPPIES logo or the show's bright-eyed and bubble-headed half-human half-fish cartoon characters that are the core of the brand" (*id.* at PageID.1186). Defendant also points out that "the marks are not similar in pronunciation, cadence, and appearance" inasmuch as Defendant visually reinforces the distinctive term "bubble" in Bubble Guppies by the use of "a water bubble as the dot on the letter "i," bubble-style lettering, and blue and green colors and shading that reference the show's underwater location" (*id.* at PageID.1187-1188).

According to Plaintiffs, the marks in this case are "exactly the same" (Dkt 208 at PageID.1578). Plaintiffs assert that "the only difference is that Viacom added the word 'Bubble' to Plaintiffs['] mark, making the infringement and likelihood of confusion significantly greater" (*id.*).

Again, the Court is more persuaded by the nuances of Defendant's argument. The record simply does not demonstrate a likelihood of confusion with Defendant's Bubble Guppies mark based on the alleged similarity of the marks, which concomitantly weakens Plaintiffs' theory that customers are likely to be confused into thinking that their goods are those of Defendant, the purported junior user.

4.     *Evidence of Actual Confusion*

Evidence of actual confusion is "undoubtedly the best evidence of likelihood of confusion."

*Therma–Scan*, 295 F.3d at 634 (quoting *Daddy's Junky Music*, 109 F.3d at 284).  In this regard,

Defendant argues that Plaintiffs have presented *no* evidence of actual confusion and that Plaintiffs

instead rely on inadequate, as well as unreliable and inadmissible hearsay (Dkt 198 at PageID.1189).

In response to Defendant's argument, Plaintiffs do not point the Court to evidence of actual

confusion but merely assert, without further elaboration, that "there is evidence of actual confusion

throughout Debbie Rohn's Affidavit" (Dkt 208 at PageID.1579).

Even assuming arguendo that Debbie Rohn's affidavit contains properly admissible evidence

of consumers' beliefs or mindset, Plaintiffs' failure to identify the portions of the affidavit upon

which they rely, or otherwise elucidate how these portions support their argument, is fatal to analysis

of this factor.  Neither Defendant nor this Court is required to study Debbie Rohn's 91-paragraph

affidavit with its 130-page attachment of unmarked documents to discern the relevant portions and

proper bases for Plaintiffs' argument.  *See* FED. R. CIV. P. 56(c)(1) (Supporting Factual Positions);

W.D. Mich. LCivR  7.1(a).  *See also Magnum Towing & Recovery v. City of Toledo*, 287 F. App'x

442, 449 (6th Cir. 2008) ("It is  not the district court's ... duty to search through the record to develop

a party's claims; the litigant must direct the court to evidence in support of its arguments before the

court."); *Wardle v. Lexington–Fayette Urban County Gov't*, 45 F. App'x 505, 509 (6th Cir. 2002)

(per curiam) ("[A] district court is not required to search the record to determine whether genuine

issues of material fact exist when the non-moving party has failed to point them out."); *InterRoyal*

*Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) ("A district court is not required to speculate

on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.").

In short, the record before the Court does not demonstrate a likelihood of confusion with Defendant's Bubble Guppies mark based on any evidence of actual confusion. This factor therefore also tips in Defendant's favor.

5.   *Marketing Channels Used*

The fifth factor requires an analysis of the parties' predominant customers and their marketing approaches. *Therma-Scan*, 295 F.3d at 636. "[I]f the services of one party are sold through different marketing media in a different marketing context than those of another seller, the likelihood that either group of buyers will be confused by similar service marks is much lower than if both parties sell their services through the same channels of trade." *Homeowners*, 931 F.2d at 1110.

Here, Defendant argues that the parties' marketing channels do not overlap inasmuch as Defendant has promoted the Bubble Guppies television show through its national media network and Plaintiffs' marketing of GUPPIE products was limited to their website, a print advertisement in the early 1990s, and Plaintiffs' display and/or donation of GUPPIE products at various trade shows, charities, and other local events in or around Cadillac, Michigan (Dkt 198 at PageID.1190-1191).

According to Plaintiffs, the overlap between the parties' marketing and advertising is "palpable" (Dkt 208 at PageID.1579), although Plaintiffs conversely concede that "the marketing channels were not exact duplicates, given that Plaintiffs are a [sic] proprietors of a small business in Western Michigan and Defendants are all worldwide behemoths" (*id.* at PageID.1579-1580).

16

Some use of the internet for marketing does not alone, and as a matter of law, constitute overlapping marketing channels. *Therma-Scan*, 295 F.3d at 637 (observing that "a non-specific reference to Internet use is no more proof of a company's marketing channels than the fact that it is listed in the Yellow Pages of the telephone directory"). The facts at bar indicate that Plaintiffs' marketing was very limited in variety, scope and geography. The record facts weigh against concluding that confusion with Defendant's Bubble Guppies mark is likely based on marketing channels.

6.     *Degree of Purchaser Care*

The standard for determining whether an ordinary purchaser would differentiate between products or services with similar marks is the exercise of ordinary caution. *Therma–Scan*, 295 F.3d at 638. Defendant argues this factor weighs in its favor because "children form a connection with the Bubble Guppies *characters*—not word marks that they cannot read" (Dkt 198 at PageID.1191 [emphasis in original]). In response, although Plaintiffs posit that this factor also supports a finding of a likelihood of confusion, Plaintiffs seemingly concede Defendant's point in acknowledging that "the purchasing decisions are largely child-driven or motivated, in particular by child identification with the Viacom show" (Dkt 208 at PageID.1580). In light of the different demographics and motivations for purchase, the record similarly does not support the conclusion that Defendant misappropriated any goodwill associated with Plaintiff's GUPPIE marks and used it to its benefit with consumers of its "Bubble Guppies" merchandise. The Court determines that this factor does not weigh in favor of finding a likelihood of confusion.

17

7.    *Defendant's Intent in Selecting the Mark*

If a party chooses a mark with the intention of creating confusion between its products and those of another company, "that fact alone may be sufficient to justify an inference of confusing similarity." *Therma-Scan*, 295 F.3d at 638 (quoting *Daddy's Junky Music*, 109 F.3d at 286). Circumstantial evidence of copying, particularly "the use of a contested mark with knowledge of the protected mark at issue," is sufficient to support an inference of intentional infringement where direct evidence is not available. *Therma-Scan*, 295 F.3d at 638-639 (citation omitted). "Where there is no evidence that the defendant actually knew that a protected trademark existed, such knowledge can be presumed if evidence exists of the plaintiff's 'extensive advertising and long-term use of a protected mark.'" *Id.* at 639 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 286). The mere pre-existence of a mark "does not support an inference that intentional copying occurred." *Therma-Scan*, 295 F.3d at 639; *Daddy's Junky Music*, 109 F.3d at 286-87.

Defendant argues that there is no evidence that Defendant intended to cause any purported consumer confusion and that no such inference can be drawn where Plaintiffs' operation is small and local, with extremely limited marketing and sales (Dkt 198 at PageID.1192, citing *Therma-Scan*, 295 F.3d at 639 (plaintiff's "small scale of operations in a limited geographical area and the fact that it has not conducted extensive advertising" can preclude a presumption of actual knowledge of a pre-existing mark)).

Plaintiffs baldly assert in response that Defendant "knowingly used Plaintiffs' word mark and plainly infringed on Plaintiffs' logo mark" (Dkt 208 at PageID.1581).

Again, mere assertions are not effective. As Defendant points out in reply, the chronology of events in this case does not permit such an inference because any communications Plaintiffs may

have sent to Defendant after they learned of the Bubble Guppies television show cannot *retroactively* create intent by the show's co-creators to pattern the show after Plaintiffs' products, or *retroactively* create intent to cause confusion with Plaintiffs' products (Dkt 203 at PageID.1421).  It is incorrect to "suggest[] that the mere prior existence of a registered mark demonstrates that the alleged infringer intentionally copied that mark." *Daddy's Junky Music*, 109 F.3d at 286-87.  Therefore, the Court determines that this factor, whether analyzed as intent or merely indifference, also weighs against a finding of likelihood of confusion, given the factual record in this case.

8.    *Likelihood of Expansion in Selecting the Mark*

The last factor to consider is the likelihood of expansion in selecting the mark.  A "strong possibility that either party will expand his business to compete with the other . . . will weigh in favor of finding that the present use is infringing." *Daddy's Junky Music*, 109 F.3d at 287 (internal quotation marks omitted).

The parties agree that the Bubble Guppies show is out of production and that Defendant does not intend to produce any additional episodes (JSF ¶ 45).  Defendant further points out that the "peak" of the Bubble Guppies apparel royalties bell curve "has already passed" (Dkt 198 at PageID.1193).

Plaintiffs respond, again with no elaboration, that "[t]here is evidence in Debbie Rohn's Affidavit herewith that supports an expansion by Plaintiffs and by Defendants" (Dkt 208 at PageID.1581).  Plaintiffs also contend that Defendant's plan to not make any new shows "has no bearing on reverse confusions effects [sic] on Plaintiffs' ability to expand" (Sur-Reply, Dkt 206 at PageID.1446).

19

The Court disagrees. "[A] finding of little evidence of expansion plans is accorded little to no weight" in the likelihood of confusion analysis. *Maker's Mark*, 679 F.3d at 424. Moreover, this factor is relevant only where a party "expand[s] his business to compete with the others or to be marketed to the same consumers," *Homeowners*, 931 F.2d at 1112 (quotation omitted), and, as determined *supra,* the record does not support a finding that these parties, either forward or reverse, target the same audiences with their products. Hence, this factor is accorded little to no weight.

In summary, the parties do not disagree on the case law and principles applicable to each factor, only their application to the facts at bar. Even viewing the factual evidence and drawing all reasonable inferences in favor of Plaintiffs, the Court determines that no genuine issue of material fact has been identified regarding the likelihood of consumer confusion between Plaintiffs' GUPPIE Mark and Defendant's Bubble Guppies Merchandise. The balance of factors leads to the conclusion that the relevant consumers are not likely to believe that the products or services offered by the parties are affiliated in some way. Plaintiffs' thinly argued and weakly supported position to the contrary is simply insufficient to defeat Defendant's motion or support a judgment in their favor. Rather, Defendant is entitled to summary judgment on the issue of its liability arising from Plaintiffs' claims, including Plaintiffs' reverse-confusion theory of liability to establish trademark infringement.

### III. DEFENDANT'S OBJECTION TO DEBBIE ROHN'S AFFIDAVIT

Defendant filed an objection (Dkt 204) to the "Affidavit of Plaintiff Debbie Rohn Regarding Summary Judgment (on Liability) Issues" (Dkt 210), arguing that the affidavit is (1) largely not made on personal knowledge or based upon facts that would be admissible in evidence and to which Debbie Rohn is competent to testify, and (2) attempts to introduce inadmissible evidence that was never produced to Defendant in discovery (Dkt 204 at PageID.1425). Specifically, Defendant

requests that the Court (1) disregard or strike from the Rohn affidavit, at a minimum, paragraphs 30, 39, 43, 45, 49,54, 55, 67, 68, 69, 70, 75, 78, 82 and subsections A–N, 84, 86, 88, 89 and 90; (2) disregard or strike from the Rohn affidavit, at a minimum, pages 20–133 of the documentary evidence that Plaintiffs offer through the Rohn affidavit; and (3) grant any further relief that the court deems just and necessary (*id.* at PageID.1431).

In response, Plaintiffs concede that Debbie Rohn's affidavit "includes material generated contemporaneously with her reading and reviewing of Defendants' Motion and Brief in Support" (Dkt 209 at PageID.1589). Plaintiffs contend that some of the material "Defendants obviously know to be true because much of it simply recites and reacts to what is in Viacom's television show or its show-related licensed merchandise or is already in the Joint Statement [of Facts (JSF)]" (*id.*). Last, Plaintiffs assert that "to the limited extent that her Affidavit contains material testimony from Mrs. Rohn which <u>might</u> have been offered by her during discovery in this case, the Court should note defense counsel extensively deposed her, that no restrictions were placed on the scope or depth of her questioning in that deposition, and that any undiscovered material in her affidavit is explained by the fact that defense counsel did not ask the questions which would have revealed what Defendants now claim they did not know before" (*id.* [emphasis in original]).

For the reasons set forth *supra*, this Court is unwilling to parse Debbie Rohn's affidavit either to find support for Plaintiffs' position or to determine which portions would be inadmissible. Rather, because this Court has not relied upon the affidavit to reach its conclusion on the issue of Defendant's liability, the Court will deny Defendant's objection as moot.

## IV.  CONCLUSION

For the foregoing reasons, the Court denies Defendant's Objection as moot, grants Defendant's Motion for Summary Judgment (Dkt 197), and denies Plaintiffs' Motion for Summary Judgment (Dkt 205).  Accordingly:

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Dkt 197) is GRANTED.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment (Dkt 205) is DENIED.

**IT IS FURTHER ORDERED** that Defendant's Objection to Debbie Rohn's Affidavit (Dkt 204) is DENIED as moot.

**IT IS FURTHER ORDERED** that counsel shall confer and, not later than February 10, 2017, file a Joint Notice advising the Court whether Judgment is properly entered in favor of all Defendants, and if not, why not, including a recommended course for resolution of this case.


DATED: January 27, 2017                    /s/ Janet T. Neff
                                            JANET T. NEFF
                                            United States District Judge